# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KRISTI BARKL,                              )
                                           )      **Case No. 10-2469**
       **Plaintiff,**                    )
                                           )      **Magistrate Judge Sidney I. Schenkier**
v.                                         )
                                           )
KAYSUN CORPORATION,                        )
                                           )
       **Defendant.**                    )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Kristi Barkl, has filed a two-count amended complaint (doc. # 19) against her former employer, Kaysun Corporation ("Kaysun"). In Count I, Ms. Barkl alleges that Kaysun is liable for breach of contract by failing to pay her salary and commissions due under her contract of employment after she was terminated on October 22, 2009 (Compl., Count I, ¶¶ 10-13). In Count II, Ms. Barkl alleges that Kaysun discriminated against her based upon her sex and created and allowed a hostile work environment to exist in violation of Title VII of the Civil Rights Act of 1964, codified as 42 U.S.C. § 2000e *et seq.* (Compl., Count II, ¶¶ 9-14, 19).

Presently before the Court is defendant's motion for summary judgment (doc. #43) on both counts of Ms. Barkl's complaint. For the reasons that follow, we grant summary judgment to defendant on all of Ms. Barkl's claims.[1]

---

[1] On June 24, 2010, pursuant to the consent of all parties and 28 U.S.C. § 636(c), this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 15). This Court has diversity jurisdiction over the contract claims alleged in Count I because "the parties are citizens of different states and the amount in controversy exceeds $75,000." 28 U.S.C. § 1332; *Andrews v. E.I. Du Pont De Nemours & Co.*, 447 F.3d 510, 514 (7th Cir. 2006). This Court has jurisdiction over the Title VII claims pursuant to 28 U.S.C. § 1331.

# I.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of establishing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To withstand a motion for summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on the essential elements of its case. *Id.* The Court will construe the evidence and all reasonable inferences in favor of the non-moving party. *Durable Mfg. Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 501 (7th Cir. 2009). When a material fact or set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. *Coles v. City of Chicago*, 361 F. Supp. 2d 740, 741-42 (N.D. Ill. 2005). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

# II.

We review the material facts that are relevant to Kaysun's motion for summary judgment, as taken from Kaysun's Local Rule 56.1(A)(3) Statement of Undisputed Facts ("DSUF") (doc. # 41), Ms. Barkl's response to DSUF (Pl.'s Resp. to DSUF) (doc. # 48), and her "Counterstatement of Uncontested Facts" (doc. # 49), *i.e.*, her Local Rule 56.1 Statement of Additional Facts ("PSAF").

The facts set forth below are undisputed unless otherwise noted by the Court.[2] "We review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

## A.

Kaysun is a Wisconsin corporation that "designs and manufactures complex, high-tolerance plastic injection molded products and assemblies" (DSUF at ¶ 1). Ms. Barkl, an Illinois citizen, was hired as a Field Sales Engineer for Kaysun on September 11, 2008, by Kaysun's President and Chief Executive Officer, Ben Harrison (*Id.* at ¶¶ 2, 10). Mr. Harrison initially offered Ms. Barkl a salary of $70,000, but Ms. Barkl requested a salary of $100,000, to which Mr. Harrison agreed (PSAF at ¶¶ 2-3).

Ms. Barkl received a letter on September 11, 2008 (the "September 2008 letter"), outlining the terms of her employment with Kaysun, which she signed and returned to Kaysun (DSUF at ¶¶ 13-14, PSAF at ¶ 4). The September 2008 letter of employment contained an annualized base salary of $100,000 for the first 18 months of her employment (DSUF at ¶ 13). After 18 months, Ms. Barkl's annualized base salary would decrease to $80,000 in anticipation of her higher commissions earnings (*Id.*). The September 2008 letter also specified that upon customers' payment of their invoices, Ms. Barkl "would be paid two percent on first-year molding sales, one and one-half percent on second-year molding sales and one percent on third-year molding sales" (*Id.* at ¶ 14; doc. # 40:

---

[2] "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements. When we cite as undisputed a statement of fact that a party has attempted to dispute, that reflects our determination that the evidence does not show that the fact is in genuine dispute." *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 899 n.2 (N.D. Ill. 2010). In this case, Kaysun does not dispute any of plaintiff's statement of additional facts (doc. # 59, Def.'s Resp. To PSAF).

3

Def.'s Exhibits, Ex. 9). The September 2008 letter did not set a fixed term for Ms. Barkl's employment.

Ms. Barkl began working for Kaysun on September 22, 2008 (DSUF at ¶ 10). At that time, Kaysun had one other Field Sales Engineer, Jeff Baker (PSAF at ¶ 6; DSUF at ¶ 16). Ms. Barkl's sales territory included all locations west of the Mississippi River, excluding Wisconsin and the Chicago area, while Mr. Baker's territory encompassed those two areas as well as all locations east of the Mississippi River (PSAF at ¶ 6).

Not long after Ms. Barkl began working for Kaysun, there were several changes in the Field Sales Engineer group. Mr. Baker resigned in early January 2009 (PSAF at ¶ 6), and Kaysun hired Mario Del Real and Mark Zelinski as Field Sales Engineers on December 29, 2008, and January 26, 2009, respectively (DSUF at ¶ 22). Both of those individuals began work on February 16, 2009 (*Id.*). A letter conveying the terms of Mr. Del Real's offer provided for an annualized base salary of $100,000 for his first 18 months at Kaysun, followed by a decrease in base salary to $87,000 (doc. # 49: Pl.'s Exhibits, Ex. 7 at 50 (Del Real employment offer)).[3] The commission structure offered to Mr. Del Real in this letter was the same as that contained in Ms. Barkl's September 2008 letter (*Id.*). The parties have failed to offer any documentary evidence of the terms of Mr. Zelinksi's employment offer. The only evidence of those terms is Mr. Harrison's uncontradicted deposition testimony that Mr. Zelinksi's starting salary was less than $100,000 per year (DSUF at ¶ 23). There is no evidence of Mr. Zelinski's commission structure.

---

[3]The letter tabbing of plaintiff's exhibits appears to be somewhat haphazard, with many different documents sometimes contained within one letter tab and with no chronological ordering of the documents or numbering of the pages within the letter tab. In addition, the copies of plaintiff's exhibits filed on the district court's electronic docket do not match the divisions set forth by the letter tabs on plaintiff's courtesy copies, making an exact correlation of documents and page numbers extremely difficult. For the sake of clarity and consistency, we refer to the exhibit numbers used on the electronic filing system and the corresponding page numbers when citing to plaintiff's exhibits.

Robert Markey received an offer of employment from Kaysun on February 19, 2009, and he started work as a Field Sales Engineer on March 2, 2009 (DSUF at ¶ 22). A letter conveying the terms of Mr. Markey's offer provided for an annualized salary of $85,000 (Pl.'s Ex. 7 at 71 (Markey employment offer)). The commission structure made available to Mr. Markey in this letter was identical to that of Ms. Barkl and Mr. Del Real (*Id.*)

With the hiring of the additional Field Sales Engineers and the resignation of Mr. Baker, Kaysun re-divided the Field Sales Engineers' territories. In or about January 2009, Ms. Barkl volunteered to relocate to Texas to cover the western and southwestern parts of the country; Kaysun accepted that offer (PSAF at ¶ 7; DSUF at ¶¶ 17-18). In conjunction with her new sales territory assignment, on January 29, 2009, Kaysun sent Ms. Barkl a letter which extended Ms. Barkl's annualized base salary of $100,000 to September 1, 2010, before reducing to $80,000 per year because of anticipated commissions earnings (the "January 2009 letter") (DSUF at ¶ 19; PSAF at ¶ 8). The commission structure laid out in the January 2009 letter was identical to that laid out in the September 2008 letter (DSUF at ¶¶ 13, 18; Def.'s Exs. 10-11). Again, the January 2009 letter did not establish a fixed term for Ms. Barkl's employment.

Kaysun alleges that in or about February 2009, it designated four of its sales accounts as "growth accounts," because Kaysun viewed them as having a high potential for growth (DSUF at ¶ 26). Kaysun created a specialized commission structure for new business from these accounts (*Id.*). Two of the growth accounts were in Mr. Del Real's territory, and two were in Mr. Zelinksi's territory (*Id.* at ¶ 27). While Ms. Barkl contends that she was unaware of the existence of growth accounts, it is undisputed that Ms. Barkl's territory at this time did not include any growth accounts (Pl.'s Resp. to DSUF at ¶¶ 25-26).

**B.**

On May 15, 2009, Kaysun terminated Messrs. Zelinski's and Markey's employment – along with that of ten other employees – as part of a "reduction-in-force due to its economic and operational needs" (DSUF at ¶ 36).[4] With these terminations, Ms. Barkl and Mr. Del Real were the only remaining Field Sales Engineers, and their territories were once again changed. Ms. Barkl was reassigned to the geographical area west of the Mississippi River and to the Chicago area, making her eligible to receive commissions on two "growth accounts" in her new territory (*Id.* at ¶¶ 36-38). Ms. Barkl does not allege any impropriety in how the territories were allocated between her and Mr. Del Real.

Prior to this reassignment, Ms. Barkl was not aware of the commission structure for "growth accounts" (Pl.'s Resp. to DSUF at ¶ 38). Nor was Ms. Barkl initially aware that any of the accounts in her newly-configured territory were "growth accounts" (*Id.*). On July 7, 2009, Ms. Barkl received an e-mail from Mr. Harrison describing Kaysun's commission policy (Pl.'s Ex. 6 at 168 (7/7/09 Harrison email)). The email stated that for accounts with "high growth potential," Field Sales Engineers would earn commissions of 1% in Year 1 and 0.5% in Year 2 for any orders involving "new injection mold tooling" (*Id.*). These growth accounts consisted of existing Kaysun customers, and Field Sales Engineers could earn commissions only by selling "new programs" to these customers (*Id.*). Mr. Harrison stated that prior to the creation of growth accounts, Kaysun employed Field Sales Engineers only to secure new customers (*Id.*).

---

[4]There is no evidence or allegation that either Mr. Zelinski or Mr. Markey was terminated due to Ms. Barkl's May 12 complaint of harassment, which we discuss below.

Mr. Harrison also attached a power point presentation to his email about the commission policy, but Ms. Barkl told him that she had never seen that specific presentation, nor had she ever been informed as to the commission policy on sales to existing customers before that e-mail (Pl.'s Ex. 6 at 170-71 (7/8/09 email exchange)). Mr. Harrison replied that he was "[s]orry for the confusion," and that he was scheduling a meeting with Ms. Barkl and Mr. Del Real to "review the policy" and "cover any other issues" (*Id.*).

On July 9, 2009, Ms. Pratt emailed Ms. Barkl and Mr. Del Real a copy of the "Kaysun Corporation Commission Policy," and requested they "print it, sign it, and then return it to [Ms. Pratt] either by mail, fax, or scan so [she] can place it in your file" (DSUF at ¶ 46; Def.'s Ex. 16 (Pratt email and Commission Policy)). The commission policy for sales to new customers was the same as specified in Ms. Barkl's and Mr. Del Real's employment letters, and the commission policy on new sales to existing customers was as described in Mr. Harrison's July 7, 2009 email and attached power point presentation, although the policy does not use the term "growth accounts" but refers generally to commissions derived from new molding sales to existing Kaysun customers (*Id.*). While Kaysun informed Messrs. Zelinski, Markey, and Del Real of the policy on sales to existing customers as part of their orientation when they were hired in February and March 2009, Ms. Barkl first found out in July 2009 (PSAF at ¶ 21). Prior to Kayson's reduction-in-force, only Messrs. Zelinski and Del Real had growth accounts in their sales territories.

The new policy also provided that: "If a sales representative's employment with Kaysun Corporation ends for any reason, voluntary or involuntary, no commission is earned after the Sales Engineer's last date of employment" (DSUF at ¶ 46). This statement cutting off commissions at the time employment ends was not set forth in either the September 2008 or January 2009 letters.

7

Ms. Barkl complained that the new commission policy was unfair (PSAF at ¶¶ 22-23). On July 24, 2009, Ms. Pratt e-mailed Ms. Barkl to tell her that the commission policy would go into effect on August 1, 2009, whether Kaysun received her signed copy or not (Pl.'s Ex. 7 at 1-2 (7/24/09 email exchange)). On July 26, 2009, Ms. Barkl sent Mr. Harrison an e-mail (and copied Ms. Pratt) explaining that she had not signed the policy because of her disagreement with the preclusion of any commission earned after termination. Specifically, Ms. Barkl wrote:

> I will need to have a lawyer review the Kaysun Commission Policies and the letter before I sign anything with regard to my agreement. The above sentence basically gives Kaysun Corporation the right to deny me commissions on programs without restriction. It states that if my employment with Kaysun Corporation ends, **for any reason, voluntary or involuntary, no commission is earned after the Sales Engineer's last date of employment**. This does not protect me if I should close a program which I develop during my employment and Kaysun decides they don't want to pay that amount of commission. Basically I could close a program with an order one day and you could let me go the very next day without being paid a commission.

(Pl.'s Ex. 7 at 2-3, 23-25 (7/26/09 email exchange) (emphasis in original)). Ms. Barkl also complained that she had not been made aware of the new commission policy until she received the July 2009 email, while the other Field Sales Engineers were made aware of the policy in February and March of that year (*Id.*).

Mr. Harrison responded to Ms. Barkl on July 28, 2009, explaining that because Ms. Barkl was an at-will employee, Kaysun had the right to change its commission policy "at any time at its discretion as outlined on page 1 in the employee handbook" (Pl.'s Ex. 7 at 22-23 (7/28/09 email exchange)).[5] Further, Mr. Harrison wrote that at the time the policy was presented to other Field Sales Engineers, there were no growth accounts in Ms. Barkl's territories, so the commission

---

[5]Neither party has provided the Court with a copy of the employee handbook. But, since the parties agree that this content is in the handbook, that omission is not significant to the outcome of the motion.

structure was "not applicable to [her] at the time;" he further stated that since the reallocation of territories after the termination of Mr. Markey and Mr. Zelinski, which resulted in Ms. Barkl first receiving growth accounts, "[t]here have been no applicable sales under such commission structure" (*Id.*). Mr. Harrison wrote that, "Kaysun believes that the policy fairly addresses how commissions are handled at the end of employment and does not intend to modify the language" (*Id.*).

Kaysun put its commission policy into effect on August 1, 2009. Ms. Barkl continued to work for Kaysun and receive compensation as outlined under that policy and the September 2008 and January 2009 letters until her termination on October 22, 2009.

## C.

During the course of her employment, Ms. Barkl was dissatisfied with other aspects of her treatment at Kaysun as well. A few months after Messrs. Del Real, Markey, and Zelinski had begun working for Kaysun in early 2009, Ms. Barkl raised a complaint about her treatment by some of those co-workers and Kaysun management.

On May 10-11, 2009, Kaysun held a meeting of all of its sales personnel at Kaysun's offices (PSAF at ¶ 9). Ms. Barkl alleges that Mr. Harrison made comments and laughed at her during the meeting, allegedly "treating her differently because she was a woman" (*Id.* at ¶ 12). On May 12, 2009, Ms. Barkl complained to Kaysun's Human Resources Director, Deb Pratt, that she was treated improperly by male sales personnel at a dinner with Mr. Zelinski and Mr. Markey on May 10, 2009, and at a sales team meeting on May 11, 2009 (DSUF at ¶ 29). Ms. Barkl provided Ms. Pratt with handwritten notes describing the allegedly harassing conduct, including Mr. Markey telling her she should not be given a second glass of wine, and both Messrs. Zelinski and Markey questioning her when she picked up the bill (*Id.* at ¶¶ 29-31). Ms. Barkl also claimed that certain unidentified male

9

sales personnel told her that she received leads that they did not, that she did not know what she was talking about, and that she was "bitchy" (*Id.* at ¶¶ 29-31). Ms. Barkl also noted that she felt that other employees "gang[ed] up" on her with regard to "tech issues;" "butt[ed] in and laugh[ed]" about her presentation; behaved unprofessionally; acted like a "Boy's Club;" questioned her credibility; and ignored her and cut her off (*Id.* at ¶ 30; Def.'s Ex. 13 (Barkl notes)). Ms. Barkl identified Mr. Markey as also having told her: "You can't talk, you shouldn't talk so much" (*Id.*; Def.'s Ex. 12 (Pratt notes)).

Mr. Harrison, David Robinson (Kayson's Vice President of Engineering), and Mark Olson (Kaysun's Chief Financial Officer) were informed of Ms. Barkl's complaints (PSAF at ¶¶ 9-11; DSUF at ¶ 34). Although Mr. Harrison did not recall discriminatory behavior at the May 2009 sales meeting (PSAF at ¶ 11), on May 21, 2009, Ms. Pratt conducted a sexual harassment training session for Kaysun employees (DSUF at ¶¶ 39-40). On May 27, 2009, Ms. Pratt emailed Ms. Barkl and Mr. Del Real a power point presentation that had been used during the anti-harassment training session, since they had missed the training, and the training was "required" of "all employees on a regular basis" (*Id.*; Def.'s Ex. 14 (5/27/09 Pratt email)).

Nonetheless, according to Ms. Barkl, there were further episodes of conduct she considered harassing. On June 29 to 30, 2009, Mr. Robinson and Ms. Barkl met with Kaysun customers in Minneapolis (PSAF at ¶ 13). During a lunch meeting, Mr. Robinson told Ms. Barkl to take notes but not to talk during the customer meeting (*Id.*). That evening, Ms. Barkl went to Mr. Robinson's hotel room to practice for the customer presentation (*Id.*). Ms. Barkl felt uncomfortable going to his room, which was so small she had to sit on the bed during the meeting (*Id.*). But, she does not allege that Mr. Robinson engaged in inappropriate conduct during that meeting (*Id.*). Later that evening

at dinner, Mr. Robinson told Ms. Barkl to be quiet during the next day's presentation (PSAF at ¶ 14). Ms. Barkl gave the presentation, and Mr. Robinson laughed at her (*Id.*).

While in Cedar Rapids for another customer meeting at some unspecified date, Ms. Barkl had dinner with Mr. Robinson and Keith Bridgford, Kayson's Vice President of Manufacturing (PSAF at ¶ 15). At dinner, Mr. Robinson told her to just sit and take notes during the next day customer meeting, complimented Ms. Barkl's hair, then stated that compliments are "what [women] expect" (*Id.*). At breakfast the next morning, Mr. Robinson and/or Mr. Bridgford stated that "[a]ll women do is file their nails" and "women don't know how to drive" (*Id.*). Ms. Barkl also alleges that in August 2009, Mr. Harrison told her she would do what she was told because he is the boss, and Mr. Harrison congratulated Mr. Del Real but not Ms. Barkl for a joint presentation they did (*Id.* at ¶ 16). Ms. Barkl was not mentioned in a company newsletter about her role in obtaining certain new business, and when she questioned Mr. Harrison about her lack of mention, he stated: "I need a drink" (*Id.* at ¶¶ 17-18).

### D.

In October 2009, Mr. Harrison prepared a performance evaluation for Ms. Barkl (DSUF at ¶ 50). The evaluation was generally positive, with rankings of "meets expectations" or above in all possible categories (*Id.*; Def.'s Ex. 17 (Barkl Perf. Eval.)). The performance review noted that "Kristi conducts herself in a professional manner and is a clearly seasoned sales executive," and that she "has shown solid potential in becoming a highly effective sales contributor to Kayson Corporation" (*Id.*). Nevertheless, the report noted that Ms. Barkl's "interpersonal skills are not always meeting [Mr. Harrison's] expectations," as she has shown frustration receiving feedback from him, and Mr. Harrison wanted her to spend less time and energy on existing customers and more

time and energy on new prospects (*Id.*). Ms. Barkl's review was scheduled to take place on October 21, 2009, at Mr. Harrison's office in Manitowoc, Wisconsin (DSUF at ¶ 51).

Ms. Barkl came to her review at the appointed time, accompanied by a man, Richard Estrada, who drove her to the office (PSAF at ¶ 27). Mr. Estrada and Ms. Barkl signed in and received Kaysun badges (*Id.*). They met Ms. Pratt at the top of the steps, and then Mr. Estrada and Ms. Barkl proceeded to Mr. Harrison's office (*Id.*). Ms. Barkl introduced Mr. Estrada as a friend, but Mr. Harrison refused to shake their hands (*Id.*). In response to Mr. Harrison's question as to why Mr. Estrada was at the review meeting, Ms. Barkl said that Mr. Estrada drove her to the review, and she asked him to sit in on the review because she was feeling ill (*Id.*). Mr. Harrison had never experienced a situation where an employee brought a third party to sit in on a performance review (DSUF at ¶ 63). Mr. Harrison told Mr. Estrada to leave (DSUF at ¶ 54; PSAF at ¶ 27). On his way out, Mr. Estrada told Mr. Harrison to "[p]lease be nice to her," and asked Ms. Barkl if she was all right (PSAF at ¶ 28).

Ms. Barkl then asked to begin the performance review (PSAF at ¶ 29). Ms. Barkl had a dictaphone or tape recorder with her, which she placed on the table between her and Mr. Harrison (PSAF at ¶ 29; DSUF at ¶ 52). Ms. Barkl asked him if she could turn it on, but she complied with his wishes when Mr. Harrison told her not to turn it on (*Id.*). Mr. Harrison left the office and returned with Mr. Robinson and Mr. Bridgford, who questioned her as to why Mr. Estrada had accompanied her to the meeting (PSAF at ¶¶ 29-33). During that conversation, Mr. Bridgford or Mr. Robinson asked why she wanted someone to sit in on the review since "[y]ou have a good performance review" (*Id.* at ¶ 31). Mr. Harrison told Ms. Barkl that he felt threatened by what had

occurred (*Id.* at ¶ 30), and cancelled Ms. Barkl's review (DSUF at ¶ 56). Mr. Harrison said the review would occur another day (PSAF at ¶ 32).

After Ms. Barkl left, Mr. Harrison called the Manitowoc Police Department to notify them of Ms. Barkl's and her companion's behavior because he considered it threatening (DSUF at ¶ 57). The next day, on October 22, 2009, Mr. Harrison emailed Ms. Barkl a letter that terminated her employment with Kaysun, effective immediately, "[a]s a result of your conduct on October 21, 2009, when you arrived at Kaysun Corporation for your performance review" (DSUF at ¶ 59; Def.'s Ex. 18). The letter further stated that: "The decision to terminate your employment is based on this unacceptable and threatening conduct which Kaysun does not tolerate" (*Id.*). Kaysun replaced Ms. Barkl with a male employee, Jeff Anderson (PSAF at ¶ 35).

### E.

Between October 22, 2009, and September 1, 2010, two Kaysun customers for whom Ms. Barkl had "commenced orders" in June 2009 placed orders with Kaysun for moldings (PSAF at ¶¶ 36-37). Plaintiff was not paid commissions on those sales (*Id.*).

On November 25, 2009, Ms. Barkl filed a claim with the EEOC alleging that Kaysun discriminated against her based on sex and that she was subjected to harassment and different terms and conditions of employment, which included, but were not limited to, her being given a different commission structure from that given to Kaysun's male employees (DSUF at ¶ 6, Def.'s Ex. 5). Ms. Barkl obtained a right-to-sue letter from the EEOC on July 19, 2010 (DSUF at ¶ 8).

### III.

We first address Ms. Barkl's state law breach of contract claims. Ms. Barkl contends that Kaysun is liable to her for certain post-termination salary payments and post-termination

13

commissions on sales she procured while still employed by Kaysun. We apply Illinois state law in this diversity jurisdiction case. *See Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001) ("A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits.").

For the reasons set forth below, we hold that: (1) Ms. Barkl's employment with Kaysun was terminable at will; and (2) Kaysun modified the terms of its employment agreement with Ms. Barkl when it implemented – and Ms. Barkl continued to work under – the new commission policy. Thus, Kaysun is entitled to summary judgment on Ms. Barkl's claim that Kaysun breached the employment contract by failing to pay her salary after termination and by failing to pay commissions on post-termination sales.

### A.

Ms. Barkl argues that under the terms of her employment agreement, Kaysun owes her salary payments from the date of her termination on October 22, 2009, through January 4, 2010, when she obtained substitute employment (Compl. at ¶ 10). Ms. Barkl argues that the January 2009 letter guaranteed her employment for a certain length of time because it extended her annualized base salary of $100,000 to September 1, 2010, before reducing to $80,000 per year, and set forth a commission structure for her first, second, and third year sales (PSAF at ¶ 8; DSUF at ¶ 14). Kaysun denies that it owes Ms. Barkl any post-termination salary, because Kaysun argues that the January 2009 letter did not change her status as an at-will employee.

The parties do not dispute that Illinois law governs the contract claim. "In Illinois, employment without a fixed duration is presumed to be at-will, unless the employee can point to a specific ordinance, state law, contract, or understanding limiting the ability of the employer to

14

discharge him." *Flaningam v. County of Winnebago*, 243 Fed. App'x 171, 173 (7th Cir. 2007) (internal citations and quotations omitted). Even "hiring at a monthly or annual salary, if no duration is specified, is considered to create an at-will employment relationship." *Pokora v. Warehouse Direct, Inc.*, 751 N.E.2d 1204, 1209 (Ill. App. Ct. 2001). The employee bears the burden of overcoming the presumption of at-will employment by showing that the parties contracted otherwise. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 363 (7th Cir. 2005).

Neither the September 11, 2008 employment letter nor the January 29, 2009 employment letter specified a date on which the parties' employment relationship would be terminated. Nevertheless, Ms. Barkl contends that this case is analogous to the employment agreement at issue in *Pokora*, 751 N.E.2d at 1207, which the Illinois appellate court held contemplated a fixed duration of employment. The agreement at issue in *Pokora* stated that "to provide incentive for you to join [the company] and time for you to build your sales, [the company] will pay you commission + with a guarantee as follows: commission + $2000/month for first 15 months then commission + $1900/month for 1 month, then commission + $1800/month for 1 month, '+' pay declines by $100/month to 0." *Id.* The *Pokora* court held that the word "guarantee" indicated the company's "unambiguous" intent to guarantee salary for a specific period of employment and thus "clearly indicated more than an at-will employment relationship." *Id.* at 1210-11.

The determinative language of "guarantee," however, is not present in the terms of Ms. Barkl's employment agreement. Although Ms. Barkl's employment agreement specifies that her annual base salary will decrease after a certain amount of time, the agreement does not guarantee Ms. Barkl employment until her salary decreases or thereafter. In addition, although the agreement sets forth her commission structure over three years, Kaysun did not guarantee Ms. Barkl employment

for those three years. Her employment agreement is more akin to at-will contracts which provide for an annual salary with no duration specified. And, it is well-settled that a contract does not impliedly "guarantee" employment for one year simply because it sets forth an annual salary. *See Jago v. Miller Fluid Power Corp.*, 615 N.E.2d 80, 81-83 (Ill. App. Ct. 1993) (holding that employment letter stating that the plaintiff would receive a base salary of $45,000 per year and incentive pay up to 20% of base salary, initially prorated but "[e]ach year thereafter" to be on a full-year basis created at-will employment relationship, not contract term of at least one year as plaintiff argued). Likewise, statements in an employment letter referring to an employee's expected commissions and contributions to the employer's growth in the years to come are "mere statements of expectation and not guarantees of employment for any specific term." *Id.* at 83; *see also Margulis v. Med. Parts Int'l, Inc.*, No. 98 C 714, 1999 WL 183648, at *7 (N.D. Ill. Mar. 25, 1999) (holding that employment contract which stated that employee was to be paid annually and included a bonus granting stock options for up to five years, did not show intent to create a minimum term of employment). Therefore, we hold that Ms. Barkl's employment agreement was at-will.

While Ms. Barkl attempts to argue that holding is not determinative of her entitlement to post-termination salary (Pl.'s Resp. at 6), this argument is a nonstarter. An at-will employment agreement, by definition, "will last for as long as is mutually satisfactory, and either employer or employee may terminate the employment 'at-will,' without liability for breach of contract." *Robinson v. BDO Seidman, LLP*, 854 N.E.2d 767, 770 (Ill. App. Ct. 2006) (internal quotations omitted). At-will employment may be terminated without just cause, so long as the reasons for termination are not otherwise illegal. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 495 (7th Cir. 2010). As will be discussed further below, Kaysun's reasons for terminating Ms. Barkl

were not otherwise illegal. Thus, because the employment agreement did not guarantee Ms. Barkl a term of employment, Kaysun does not owe Ms. Barkl any post-termination salary.

## B.

Ms. Barkl next contends that Kaysun breached the employment agreement by failing to pay her commission on post-termination sales which she helped procure before her termination. Kaysun maintains that under the terms of Ms. Barkl's employment agreement – as modified on August 1, 2009 – Kaysun does not owe Ms. Barkl any post-termination commissions. Ms. Barkl was emailed a copy of the new commission policy on July 7, 2009, and she was informed on July 24, 2009, that the policy would go into effect on August 1, 2009. The policy stated that "no commission is earned after the Sales Engineer's last date of employment," thus cutting off commissions for sales after an employee's termination, whatever his or her pre-termination role in helping to secure that sale.

There can be no dispute that under this policy, Ms. Barkl would not be entitled to receive the commissions she now seeks. However, Ms. Barkl contends that the new policy is not effective as to her because it was not a valid modification of the terms of her employment agreement.

When an employment agreement is terminable at-will, as we have found Ms. Barkl's was, the employer has a right to unilaterally modify the terms of the agreement, including the compensation terms. *Geary v. Telular Corp.*, 793 N.E.2d 128, 131 (Ill. App. Ct. 2003). "When an at-will employee continues to work after a change in commission plan, he is deemed to have accepted the change." *Id.* (holding that at-will employee accepted employer's unilateral modifications to his commission structure when he accepted payment of commissions under the modified plan and continued employment). "[E]mployers and employees can manifest their assent

to conditions of employment by conduct alone." *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005).

In *Schoppert v. CCTC Int'l, Inc.*, 972 F. Supp. 444, 447 (N.D. Ill. 1997), the employer moved for summary judgment on Mr. Schoppert's claim that he was entitled to the commission rate laid out in his employment letter of January 11, 1990, despite two subsequent modifications to that agreement: first, a change to the commission rate in December 1991, and second, a change to both the employee's salary and his commission rate in August 1994. *Schoppert*, 972 F. Supp. at 446. At the time Mr. Schoppert was informed of the 1991 modification, he told company executives that it was not acceptable. *Id.* at 445. Despite his objections, the policy went into effect on September 1, 1991. *Id.* The court found that Mr. Schoppert had accepted the 1991 modification by continuing to work for and to receive commission payments from the company, even if that acceptance may have been "grudging and protest-filled." *Id.* at 447. Continued performance by the employee and employment by the company "serve[d] as acceptance by one side and consideration by the other side." *Id.*; *see also Bommelman v. Transfer Print Foils, Inc.*, No. 97 C 2082, 2000 WL 816792, at *8-9 (N.D. Ill. June 22, 2000) (granting summary judgment in favor of employer on employee's breach of contract claim where employee continued performing even after his salary was reduced, despite employee's attempt to restore his original employment terms).

The *Schoppert* court, however, found that there was a triable issue of fact as to whether Mr. Schoppert accepted the terms of the 1994 modification. *Schoppert*, 972 F. Supp. at 449. The employer had sought Mr. Schoppert's signature as evidence of his acceptance of the 1994 modification, and the 1994 modification contained a requirement that he sign a non-compete agreement. *Id.* Mr. Schoppert refused to sign either the modification or the non-compete agreement,

and he continued to discuss alternate proposals and engage in negotiations with his employer. *Id.* The court held that because the employer "required" these signatures – and in light of other evidence suggesting that the employer "viewed Schoppert as having rejected the 1994 modification" – there was a genuine issue of material fact as to whether Mr. Schoppert rejected the modification or whether his continued performance constituted acceptance of the 1994 modification. *Id.*

Kayson's August 1, 2009, modification of Ms. Barkl's employment agreement is more similar to the 1991 modification in *Schoppert* than to the 1994 modification that the court found created a triable issue. Although Kaysun requested Ms. Barkl's signature on the new commissions policy, her signature was not required for it to go into effect. Though Ms. Barkl objected to the modifications via e-mail on July 26, 2009, both Kaysun's Human Resources Manager (Ms. Pratt) and its CEO (Mr. Harrison) made it plain that Kaysun would put the new policy into effect on August 1, 2009, regardless of whether Ms. Barkl objected, and with or without her signature. Unlike the 1994 modification in *Schoppert*, Kaysun was not seeking to add other contractual terms – such as a non-compete clause – that might require Ms. Barkl's affirmative consent, and Ms. Barkl presents no evidence that she attempted to object to or change the terms of Kaysun's modified commission policy after her July 26, 2009 email. Rather, Ms. Barkl continued working for Kaysun for approximately three months after the policy went into effect on August 1, 2009. By this conduct, Ms. Barkl – like the plaintiff in *Schoppert* – accepted Kaysun's modification of its commission policy, even if that acceptance was "grudging and protest-filled." *Schoppert*, 972 F. Supp. at 447.[6]

---

[6] *Bartinikas v. Clarklift of Chicago North, Inc.*, 508 F. Supp. 959 (N.D. Ill. 1981), which Ms. Barkl relies on, does not change this analysis. In *Bartinikas*, the district court reiterated the rule that an employer cannot *ex parte* modify the terms of an employment contract without the consent of the employee. *Id.* at 961. Here, Ms. Barkl's continued performance constituted consent to the modifications under Illinois law.

Thus, Ms. Barkl presents no genuine dispute of material fact as to her acceptance of Kaysun's modification of the commission policy by her continued employment and receipt of payment. Since the August 1, 2009 modification provided that "no commission is earned after the Sales Engineer's [Ms. Barkl's] last date of employment," Ms. Barkl is not entitled to post-termination commission from Kaysun, and Kaysun did not breach the parties' employment agreement by failing to pay commission.[7] For the foregoing reasons, Kaysun's motion for summary judgment on Count I of Ms. Barkl's amended complaint is granted.

## IV.

We now turn to Kaysun's motion for summary judgment on Ms. Barkl's Title VII claims. Title VII prohibits an employer from discriminating against an employee "with respect to [her] compensation, terms, conditions or privileges of employment, because of ... [her] sex." 42 U.S.C. § 2000e-2(a)(1). Plaintiffs may prove sex discrimination under a direct or indirect framework. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009).

To survive summary judgment under the direct method, a plaintiff must "present either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated his firing." *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011). Circumstantial evidence may include "suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better

---

[7] The parties dispute the applicability of Illinois' "procuring cause" rule, which provides that in the absence of contractual terms to the contrary, "a salesperson can recover commissions on sales made after the termination of the agency relationship if the salesperson 'procured the sales through its activities prior to [the] termination of the agency relationship.'" *Solo Sales, Inc. v. N. Am. OMCG, Inc.*, 702 N.E.2d 652, 653 (Ill. Ct. App. 1998). We need not resolve that dispute, however, because Ms. Barkl's employment agreement made her ineligible to receive commissions after her termination under any circumstances.

treatment." *Id.* The circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Id.*; *see also Diaz v. Kraft Foods Global, Inc.*, – F.3d –, 2011 WL 3437028, at \*4, 7 (7th Cir. Aug. 8, 2011).

Alternatively, the indirect framework – the "*McDonnell Douglas*" burden-shifting method of proof – requires a plaintiff to first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) her job performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class received more favorable treatment. *Burnell*, 647 F.3d at 709; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once a Title VII plaintiff offers evidence to show a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action, at which point the employee must produce evidence that the proffered non-discriminatory reason is a pretext for discrimination. *Id.*

In Count II of the complaint, Ms. Barkl alleges that Kaysun subjected her to sex discrimination by: (1) paying her a less favorable rate than that paid to male employees; (2) terminating her employment; and (3) subjecting her to a continuous pattern of harassment, which created a hostile work environment (Compl., Count II, ¶¶ 9-14).[8] Ms. Barkl maintains that she has presented sufficient evidence to proceed to trial on these claims, both under the direct and indirect method of proof (Pl.'s Opp'n Br. at 8-11). For the following reasons, we disagree.

---

[8] Kaysun also argues that Ms. Barkl does not have a triable claim of retaliation for her complaint of sexual harassment (Kaysun Mem. at 12). Ms. Barkl, however, did not raise this claim in her complaint, nor does she respond to the argument in her opposition to Kaysun's motion for summary judgment. Accordingly, we do not address the issue here.

## A.

Ms. Barkl contends that she has offered evidence of sex discrimination because her male co-workers received salaries similar to hers, despite her higher qualifications, and because Kaysun failed to inform her of its revised commission policy until several months after informing its male employees, which commission policy itself Ms. Barkl alleges was discriminatory (Pl.'s Opp'n Br. at 9-10). For the reasons that follow, we find that Ms. Barkl has failed to demonstrate a triable issue on either claim.

### 1.

Ms. Barkl has not raised a triable issue of sex discrimination in salary because she has not presented evidence that the male Field Sales Engineers were less qualified for the position than she was. This showing is necessary under both the direct method of proof (to show "evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment," *Diaz*, 2011 WL 3437028, at *4, 7) and the indirect method of proof (to show that similarly situated employees outside her protected class received more favorable treatment, *Burnell*, 647 F.3d at 709).

According to her resume, Ms. Barkl had 23 years of experience with sales of engineering plastics (Pl.'s Ex. 7 at 32 (Barkl resume)). By contrast, Mr. Zelinski had 30 years of experience with sales of various products including construction equipment, tapes and packaging systems, engineered materials, and specialty paper (Pl.'s Ex. 7 at 62 (Zelinski resume)); Mr. Markey had 23 years of experience with sales of products including laser printing and processing systems and electronic components (Pl.'s Ex. 7 at 75 (Markey resume)); and Mr. Del Real worked as a product and system engineer for 5 years before turning to product sales and account management for 5 years after that

(Pl.'s Ex. 7 at 60 (Del Real resume)). Mr. Zelinski also had a Master of Business Administration, while Ms. Barkl stopped her education after her bachelor's degree. In the face of Ms. Barkl's failure to point to evidence that she was more qualified than these individuals, she has failed to create a triable issue on whether she should have been paid more than they were paid.

Moreover, the undisputed facts show that Ms. Barkl's initial salary was higher than that of Messrs. Zelinski and Markey, and was the same as that of Mr. Del Real. The evidence also indicates that there was no difference in their respective commission structures on sales to new customers; and, there is no evidence that the assignment of "growth accounts" was sex-based. The summary judgment record shows that Ms. Barkl's base salary was due to drop from $100,000 per year to $80,000 per year after 24 months, while Mr. Del Real's base salary of $100,000 was due to drop to $87,000 per year after 18 months. In light of the foregoing this small differential does not create a triable issue of sex discrimination in pay.

### 2.

In addition, Ms. Barkl has not raised a triable issue of sex discrimination in Kayson's new commission structure, or her delayed knowledge of it. Although Ms. Barkl was not told of the new commissions policy until several months after her male co-workers were informed, the new commissions policy did not apply to Ms. Barkl at the time her male co-workers were informed, and they found out about the policy during their new employee orientation meeting, which Ms. Barkl did not need to attend. Under the direct method, this evidence does not present a triable issue that her co-workers received "systematically" better treatment, nor does it "point directly to a discriminatory reason" for the delay in giving her the information. *See Diaz*, 2011 WL 3437028; *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010). Likewise, because this delay in information

23

did not affect Ms. Barkl's commissions or her job responsibilities, she has not presented evidence that she suffered an adverse employment action, as required to survive summary judgment under the indirect method. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (reiterating rule that a materially adverse employment action "is something more disruptive than a mere inconvenience or an alteration of job responsibilities," such as diminishing an employee's financial terms of employment, career prospects, or workplace conditions).

Moreover, Ms. Barkl has not presented any evidence that the commission structure was discriminatorily applied. There is no dispute that the same commission structure applied to all Field Sales Engineers, and Ms. Barkl has not presented any evidence that the allocation of Kayson's four growth accounts – which constituted the "existing customers" referred to in the new commissions policy – was based on anything other than the geographical locations of those accounts. To the contrary, after Kaysun's reduction in force, Ms. Barkl's territory grew to include two of the four growth accounts. This evidence would not permit a jury to reasonably find that Ms. Barkl's male co-workers received "systematically" better treatment, *see Diaz*, 2011 WL 3437028, or that Kaysun's application and allocation of the commissions policy constituted an adverse employment action, as required to survive summary judgment under the indirect method. *See Nichols*, 510 F.3d at 780.

## B.

Ms. Barkl next contends that she presents a triable issue of fact under both methods of proof that she was terminated because of her sex. Ms. Barkl argues that her termination constituted discrimination under the direct method because "[t]o argue that bringing another person to a meeting, which person then immediately left after being requested to do so, is misconduct stretches credulity beyond all limits" (Pl.'s Opp'n Br. at 10). We disagree. As we explain more fully below, Ms. Barkl

has failed to offer any evidence that this was not the real reason for the termination decision. And, "it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 738 (7th Cir. 2011). Thus, Ms. Barkl does not raise a triable issue of material fact that her termination constituted sex discrimination under the direct method of proof.

Furthermore, Ms. Barkl's claim of discrimination based on her termination does not survive under the indirect method because she does not present evidence that Kaysun treated similarly situated male employees more favorably. In this case, the "critical independent variable can be isolated only by identifying an employee who engaged in misconduct similar to [Ms. Barkl] . . . but who nevertheless received more favorable treatment." *Argyropoulous v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008). Here, however, there is no evidence of a male employee who engaged in the same conduct as Ms. Barkl by bringing another individual to a job performance review or placing a recording device on the table in front of Mr. Harrison to record the review. Nor is there evidence that Kaysun would have acted differently if a man had brought an individual to his performance review. Thus, the "critical independent variable" is absent here, and Ms. Barkl "cannot avail herself of the indirect method to avoid summary judgment." *Argyropoulous*, 539 F.3d at 735-36.

Moreover, even if Ms. Barkl could establish a *prima facie* case, she has produced no evidence that the proffered non-discriminatory reason for her termination was a pretext for discrimination. *Burnell*, 647 F.3d at 709. When Ms. Barkl first brought an outsider, Mr. Estrada, to the evaluation and then attempted to record the meeting, Mr. Harrison promptly left the office and returned with Mr. Robinson and Mr. Bridgford because Mr. Harrison said he felt threatened (PSAF at ¶¶ 29-33). The undisputed evidence is that Mr. Harrison then called the police to notify them of Ms. Barkl's

and her companion's behavior, because he considered it threatening (DSUF at ¶ 57). While Ms. Barkl contends that Kaysun's alleged reason for terminating her employment "is so bizarre on its face it virtually screams 'pretext'" (Pl.'s Opp'n Br. at 12), this is mere *ipse dixit* and not evidence. And, tellingly, Ms. Barkl presents no evidence of pretext.

To the contrary, the undisputed evidence is that Mr. Harrison's performance review of Ms. Barkl was generally positive. Ms. Barkl has offered no evidence to show why Mr. Harrison, who was poised to deliver Ms. Barkl a good job review, would then do an about-face and fire her 24 hours later, if not for the reason Mr. Harrison gave. The fact that Mr. Harrison promptly called the police to report the incident is further evidence – which plaintiff fails to counter – that Mr. Harrison in fact felt threatened and acted on that feeling, and not on the basis of Ms. Barkl's gender.

An employer is entitled to set the rules of its workplace; "[w]e do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005). Kaysun has articulated "a plausible, legal reason for discharging the plaintiff." *Silverman*, 637 F.3d at 738. So long as an employer's decisions are non-discriminatory, it is not the province of the courts to decide if these decisions are wise ones. While Ms. Barkl may feel that Mr. Harrison over-reacted to the events of October 21, 2009, she has failed to point to evidence that the real reason for Kayson's decision was discriminatory. Thus, Ms. Barkl has failed to create a triable issue on her termination, and we grant summary judgment for Kaysun on Ms. Barkl's termination claim.

## C.

Lastly, Ms. Barkl alleges that she was harassed and subjected to a hostile work environment in violation of Title VII, as a result of sexist comments made by her male Kaysun co-workers and supervisors (Compl. ¶ 13). To survive summary judgment on her hostile work environment claim, Ms. Barkl must show: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her gender; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Kaysun contends that Ms. Barkl has not presented a triable issue that the alleged conduct was severe enough to create a hostile work environment (Def.'s Mem. at 15).

"To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment." *Scruggs*, 587 F.3d at 840. In making this determination, the court considers "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.* "Offhand comments, isolated incidents, and simple teasing" are not sufficiently severe or pervasive to create a hostile work environment. *Id.* at 840-141. In *Scruggs*, the Seventh Circuit held that the plaintiff's male co-worker's comments, including that she was "made for the back seat of a car" and looked like a "dyke," constituted "occasional inappropriate comments" that were not objectively severe or pervasive, and affirmed summary judgment on the plaintiff's hostile work environment claim. *Id.*

The comments allegedly made by Ms. Barkl's coworkers – Messrs. Markey and Zelinski and other identified co-workers – were made once, and never repeated. At a sales personnel dinner with

Mr. Zelinski and Mr. Markey on May 10, 2009, Mr. Markey allegedly told Ms. Barkl that she should not be given a second glass of wine, and both Messrs. Zelinski and Markey questioned why she picked up the bill (DSUF at ¶¶ 29-31). At a sales team meeting the next day, Ms. Barkl claimed that Mr. Markey told her she "can't talk" and "shouldn't talk so much," and that unidentified male co-workers told her that she received leads that they did not, that she did not know what she was talking about, and that she was "bitchy" (*Id.*). Ms. Barkl felt that the other employees "gang[ed] up" on her with regard to "tech issues;" "butt[ed] in and laugh[ed] about her presentation, behaved unprofessionally; acted like a "Boy's Club;" questioned her credibility; ignored her; and cut her off (*Id.* at ¶ 31). While inappropriate, these alleged comments and actions were isolated, and under the standard set forth in *Scruggs*, are not severe or pervasive enough to survive summary judgment.

Similarly, the comments by Kaysun management – Mr. Harrison, Mr. Robinson, and/or Mr. Bridgford – were inappropriate, but were not severe or pervasive so as to create a triable issue on a hostile workplace claim. The sum total of Ms. Barkl's evidence that they sexually harassed her is as follows. At the May 2009 meeting described above, Mr. Harrison made comments and laughed at Ms. Barkl, "treating her differently because she was a woman" (PSAF at ¶ 12). Further, at a separate meeting, Mr. Harrison told her she would do as she was told because he is the boss, and he responded to some of her concerns with the comment that he "need[s] a drink" and that "[t]his is a joke" (*Id.* at ¶¶ 15-16). Mr. Harrison also failed to give her credit for a joint presentation with Mr. Del Real and for her role in obtaining new business (*Id.* at ¶¶ 16-18). In Minneapolis for another meeting, Mr. Robinson requested a meeting in his hotel room, told her not to talk during the next day's customer meeting, and laughed at her when she gave a presentation the next day (*Id.* at ¶ 14). On one other occasion, Mr. Robinson told her to just sit and take notes during a meeting with a

customer, complimented her hair, and then stated that compliments are "what [women] expect" (*Id.* at ¶ 15). At breakfast the next morning, Mr. Robinson and/or Mr. Bridgford allegedly stated that "[a]ll women do is file their nails" and "women don't know how to drive" (*Id.*).

None of these comments qualifies Kaysun management for a sensitivity award; we expect people at such a high level of management to comport themselves far better. But, when measured against the conduct at issue in *Scruggs* and other cases like it, the conduct alleged here was not severe or pervasive so as to create a triable hostile work environment claim. Thus, Kaysun's motion for summary judgment on Count II of Ms. Barkl's amended complaint is granted.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment (doc. # 42) is granted in its entirety.

**ENTER:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated: October 13, 2011**